**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**
**AT HARRISBURG**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Docket No.: 1:12-CR-43 |
| | ) | (Judge Caldwell) |
| NURA ZIADEH | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**SENTENCING MEMORANDUM**
**ON BEHALF OF NURA ZIADEH**

Through counsel, Nura Ziadeh ("Ms. Ziadeh") files the following Sentencing Memorandum setting forth all factors the Court should consider in determining what type and length of sentence is sufficient, but not greater than necessary, to comply with the statutory directives set forth in 18 U.S.C. § 3553(a).

In this case, the Sentencing Guidelines recommend a range of imprisonment of 46 to 57 months. Ms. Ziadeh submits this Sentencing Memorandum in an attempt to educate the Court about her life, her family, and the circumstances that have brought her to this sentencing. Ms. Ziadeh requests a sentence of probation followed by supervised release.

United States Supreme Court Justice Anthony Kennedy has stated that, "our resources are misspent, our punishments too severe, our sentences too long."[1]

---

1 Justice Anthony Kennedy, Speech at the American Bar Association Annual Meeting (August 9, 2003) available at http://74.125.47.132/search?q=cache:RaV8HeXt5s0J:www.supremecourtus.gov/publicinfo/speeches/sp_08-0903.html+Justice+Anthony+Kennedy,+American+Bar+Association+meeting,+August+9,+2003&cd=1&hl=en&ct=clnk&gl=us

It is incumbent on this Court to, "consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Koon v. United States*, 518, U.S. 81, 113 (1996).

Ms. Ziadeh believes that a sentence of probation is sufficient, but not greater than necessary to comply with sentencing directives of 18 U.S.C. 3553(a).

## APPLICATION OF THE STATUTORY SENTENCING FACTORS
## TO THIS CASE

In the present case, the following factors must be considered when determining what type and length of sentence is sufficient, but not greater than necessary, to satisfy the purposes of sentencing:

**1.     The Nature and Circumstances of the Offense and the History and Characteristics of the Offender**

**(a) Nature and Circumstances of Offense**

As detailed in the Plea Agreement and the Presentence Report, Ms. Ziadeh plead guilty to five counts charging violations of 8 U.S.C. 1324(A)(1)(A)(iii).

**(b) History and Characteristics of Ms. Ziadeh**

In support of Ms. Ziadeh's history and characteristics, she submits her personal life story told in her own words for the Court's consideration:

*My name is Nura Ziadeh and I was born in Cairo Egypt on March 21st, 1951. My mother, Zainab, was born in Cairo, Egypt, but her parents were Moroccan and Turkish. My father, Abdulmanan Ilyas, was born in Sumatera, Indonesia, and he studied in Al-Azhar University in Cairo, Egypt. He met my mother in Cairo, Egypt, where they got married and had six children. I am the fourth out of six children.*

*We lived in Cairo until 1957, when my dad was called by the government of Indonesia to work for them. Because Indonesia was newly developing, they wanted the citizens who graduated from college to work for the government. My mother, father, and my siblings, except for my oldest sister who was already married at the time, had to move to Jakarta, Indonesia, where my father worked as a judge.*

*When we moved to Jakarta, the government moved us to a small island in Indonesia, called Riau. After we lived there for 1 year, my mother did not like it, because it was a small city and she was used to living in luxury in Cairo, Egypt. So, she asked to move to Jakarta (the capital of Indonesia), but my father stayed in the small island of Rio. In 1960, my mother asked to move back to Cairo, Egypt, so we all moved back to Cairo, except for my father.*

*My mother took care of us using the money that she inherited from her father. My mother asked for my father to help financially, but he could not send the money because the country was newly developing, in the 1960s. So he was not able to send money internationally at the time. We had no place to live, so my mom left me and my 2 brothers in my grandmother's house (my mother's mother), and my sister and other brother stayed at my aunt's house. My oldest sister was already married at the time. In 1962, my father contacted the Indonesian embassy in Cairo, Egypt, to bring me and 3 of my siblings to Indonesia.*

*The embassy tried to contact my grandmother, because we had no permanent address, at the time. They informed my grandmother that they were commanded to take the four of us to take us to our father. Because my grandmother was unable to make the decision, and because my mother was out of town at the time attending a wedding, my grandmother told my oldest sister. My oldest sister agreed to allow us to be taken by the embassy to be with our father.  Two days*

*later, the workers of the Indonesian embassy in Cairo, picked the four of us up and took us to the Port Said.*

*My siblings and I were told that my mother was already waiting for us on the ship, so that we would get on the ship. We were taken by a small boat that took us to the big ship. The worker of the embassy, gave all our information and paperwork to the captain on the ship and he left us on the ship. When we got on the ship we were expecting to see our mother, but she was not there. They lied to us to get us on the ship. We all cried but the ship had already taken off. We were on the sea for 28 days.*

*When we got to Jakarta, my father was not at the port to pick us up. He told his friend to meet us there, because my father was not able to come to Jakarta due to his job. We were taken to a house in Jakarta, which was given by the government to my father. My father's friend and a maid were the only ones living there at the time. At that time, we heard that my father had already gotten remarried and lived with his wife at the small island where he worked, in Riau. Two weeks later, my father came.*

*Because my father's wife was unwilling to take care of us, I was told to go to boarding school, while my little brother was told to live with my uncle (my father's brother), my older brother lived in the house in Jakarta with my father's friend and the maid (my brother was 12 years old at the time), and my little sister was taken to Riau to live with my father and his new wife. Six months later, my older brother fell off of a mango tree and broke his spine. He became paralyzed. He was taken to the hospital, but my father could not come until 2 weeks later. My father tried to have him released from the hospital and take him to Riau where he lived, so he can take care of him.*

*Because my father was afraid that something would happen to the rest of us, he took me and my younger brother along to Riau to live with him and his wife. My older brother had to stay in the hospital. In 1962, while living with my stepmother, my younger siblings and I suffered. My stepmother told my father that we had to do all the house work, like clean, wash clothes, iron, sweep and mop the floors, etc. At that time, she was pregnant.*

*In 1963, my father asked the government to be moved to Jakarta for my older brother who was still hospitalized, and because my stepmother was always in pain, because she just gave birth. When we got Jakarta, we went to visit my brother at the hospital, and we saw that he was not taken care off. He was completely paralyzed, and by that time he was not moving at all.*

*Because I was so upset seeing my sick brother, and I missed my mother so much, and because of the way my stepmother treated me and my siblings, I became depressed. I tried to commit suicide by taking a lot of aspirin. My little brother and sister came in to the room, and I was unconscious. I stayed in the hospital for 2 weeks.*

*20 months after being hospitalized, my older brother passed away. My mother was told the news, and she was very upset and angry. From then on, I was admitted to hospital often from depression. I liked being in the hospital more than being at home, where I had to face my stepmother. When I turned 14, the doctor that always took care of me in the hospital always came visited me at home to check on me. Because I was physically more mature than other girls my age in Indonesia, he asked to marry me.*

*I was not ready to get married, because I wanted to go to the school, but my stepmother pushed my father to agree to get me married, because she did not want me to live in the house. Because I felt hopeless at the time, I agreed to get married.*

Ajo Sukarjan was the name of my first husband. He was 14 years older than me. He took me to his older sister's house in a small village to live with them, because my stepmother wanted me out of the house. At 15 years old, I was pregnant with my first child, Halla. When Halla was 1 year old, my husband was sent to Irian Barat for a job at a small island, because there were not that many doctors there at the time. There, I was pregnant with my second child, Kemal. Because my husband always worked late, I was afraid to be home alone. So, I asked to have a nurse from the hospital to stay with me when he works late.

One day, he came home late at night, when I was 7 months pregnant, I woke up in the middle of the night and saw my husband was sleeping with nurse. So I went back to the room and did not say anything because I was afraid. I was afraid to say anything to them because I had nowhere to go and the island was filled with primitive people at the time. Since then, I cried every day and asked to move to Jayapura, a bigger city in Irian Barat. My husband finally took me to Jayapura by boat, which took 2 whole days.

One week before I gave birth to my second child, he came, and three months after giving birth, I asked to move back to Jakarta, back to my father. I wanted to tell my father about what I saw that night so my father would allow me to get a divorce. My father and stepmother did not support or believed me at all. They called me a liar. Because of this, I tried to commit suicide, by take many tablets of Valium. My neighbor saw me unconscious in the yard outside my father's house. My father took me to the hospital. My father sent my husband telegram telling him to come as soon as possible. A week later, my husband came and apologized for what he did and promised that he would not do it again.

*Because I had no other place to live and no shelter, I accepted his apology and moved back with him. In 1968, he moved from Irian Barat to Kerawang, a small city which is about 3 hours from Jakarta by car.*

*In 1969, I was pregnant with my third child, Rita. I gave birth in the end of 1970. My husband often left me to go to small cities outside of Kerawang to perform surgeries. I heard from some nurses or other doctors' wives that my husband was having an affair with a nurse that he often travelled with to those small cities.*

*By this time, I was already mature. So I let him do what he wanted to without saying anything to him. The wife of his friend told me to record that nurse telling me that he was having an affair with my husband, so that I can prove to my father that I was not lying. At the time my daughter, Rita, was only seven months old. I went to the nurse's house and I told her that I knew about her affair with my husband. I told her that I am fine with her marrying my husband, because I no longer loved my husband. The nurse cried and apologized to me. She admitted that she was sleeping with my husband and that my husband took her virginity, which is sacred in the Indonesian culture. I recorded everything she said, and happily I went home. I did not mention this to my husband. I told him that I wanted to go to visit my father for 2 days.*

*I let my father and stepmother hear the recording of the nurse confessing to sleeping with husband, and my father was angry. I went back to Kerawang with my father, because my father wanted to speak to him about the affair. My husband was not able to deny it. Because he took her virginity, my husband has to marry the nurse. But he did not want to divorce me. My father disagreed with bigamy and asked my husband to choose me or the nurse. My husband asked for some time to think. Because Kerawang is such a small town, this scandal spread quickly, and the*

nurse's reputation was ruined. So she did not want to stay in Kerawang and no longer wanted to marry Ajo because she was ashamed. Ajo and I divorced, and I moved back to my father's house.

I took Kemal and Rita, while Halla stayed with Ajo's older sister. My younger sister was already married by this time. Because she had two sons but badly wanted a daughter, she took care of Rita. During this period of time, I often socialized and had many friends, because I did not like to stay at home with my stepmother. I often left my son Kemal at home with a babysitter. Because my father did not like this, he sent me to Egypt to my mother, and I gave my son to his dad.

At 19 years old, I went back to live with my mother and visited my older sister. This is when my mother told me that she tried to get me and my 3 siblings to come back from Indonesia but was unable to. Instead, she got a divorce paper from my father. I often visited my older sister, who was close friends with Rashid Ziadeh's mother. Because Rashid and his siblings were around my age, my older sister introduced me to them. My older sister put me in school to take English courses for one year. This is when my relationship started with Rashid.

Two years after living in Egypt, and after being engaged to Rashid for a year, I received a letter from Indonesia stating that my father is very sick and needs me and my older sister to go back to Indonesia. My sister left first, and I followed two months later. When I got there, I found that my father was actually well and not sick as the letter had said. My father wanted me to take care of my kids. Because of my improved English, from the classes I took in Cairo, I got a job at Boraq Airlines, so that I would get free tickets after 1 year of working, so I can go back to Cairo to see Rashid.

A year after working, I met my friend's older brother, who was interested in me. His name was Fuad. He was a gambler, a drinker, and often had many girls. Somehow, I was

*attracted to him despite his behavior. My father knew Fuad's characteristics, and threatened me that he would disown me if I married him. Still, I married him in 1975. After I married him, I realized that I made a mistake, but I could do nothing about it. A week after the wedding, Fuad sold the car that my father bought me and used the money for gambling and to pay the rent for our house. Because I was ashamed, I did not want to tell my parents about my situation.*

*In 1977, I had my first child with Fuad, Samira. Because he used all my money, I had to go back to work to help pay for expenses. I worked at a travel agent. Then, I was pregnant with my second child, Yusuf. While I was pregnant, my husband was in a severe accident, while going out of town with another woman who he was having an affair with. He was temporarily blind. I sold all my gold to take care of him, until his vision came back and he was well again, a year later. We moved to another house.*

*My father heard about my situation, so he sent my younger sister, Susan to see how I was. He helped me financially during this time. After I gave birth to my third child with Fuad, Mubarak, my husband went back to his old ways and often physically abused me when he came home drunk. I went back to my father and apologized. I told him everything that was happening with my husband. My father believed my right away, because he knew of my husband's characteristics, and he supported me in divorcing him.*

*My father called a friend of his who was judge in the Court of Religion to help me with this divorce, because my husband refused to divorce me. After we were divorced in 1982, my father gave all his children their inheritance. He gave me a house to live in. I lived in that house with my children. I tried to find any job to provide for my children. A year after the divorce, my ex-husband Fuad came to tell me that he was going to get remarried and he wanted to take the kids and have his new wife take care of them. Because I was living alone, I felt lonely, so I*

*decided to go back to Cairo to visit my mother's grave (she passed away in 1980) and to meet with Rashid.*

*When I arrived in Egypt, in 1984, I was told that Rashid was no longer in Egypt; he had moved to America. I stayed in Egypt for 6 months, and then went back to Indonesia. I searched for a job. I promised myself that the next time I get married, I would marry a man that is religious and would not make the same mistake again.*

*I worked for a company that helps widows and single mothers, like myself, to get a job out of the country as a domestic worker. There I met, my third husband, Haydar, who was religious and graduated from a religious university in Mekkah. He was a kind person, and I liked the fact that he was very religious. He was never previously married. Because he was interested in me, I told him to come to see my father.*

*My father approved immediately because he was a religious man. After we got married, his parents was unhappy because I was already divorced and had kids, before marrying him. They wanted him to marry one of his relatives. They tried in every way possible to break us apart, even though I already had two kids from him, Mannatullah and Manal Maryana. After his parents passed away while still disappointed about him marrying me, all 18 of his siblings, begged for him to marry a relative of his, so that his parents' souls can rest in peace. Because he was pressured by his siblings, he agreed.*

*He asked for my permission to visit his father and mother's grave in another island, Sulawesi. I found that all my gold was gone, because he took them to propose to his new wife. A week later, I heard from some of his family members that he was getting married in one week. I was surprised and tried to contact him. I told him that I would bring my kids to Sulawesi to see him there. He threatened to divorce me if I followed him to Sulawesi. Even though I was broken-*

*hearted, I could not bear to see my kids without their father, so I waited at home and prayed to God to give me patience.*

*Two weeks after he got married, his brothers came to my house bringing divorce papers for me to sign. At this time I was frustrated and angry and did not know what to do, while my two kids were screaming for their father. Three months later, he called me and apologized for what he did and asked to speak to his children. Manna was 4 years old and Manal was 1 year old. Manna screamed and cried at her father to come back home. Because of my children, I forgave him. I bought him a ticket to come back to me and my children in Jakarta. For my children's sake, I let him bring his new wife to Jakarta, too. I let his wife live in the house that was given to me by my father, because she was already pregnant by that time. I lived in a different house with my children. I treated his wife like a friend and little sister, even though I saw her wearing my gold that was my husband gave her.*

*Haydar and I started working again to pay for our family and his new family. I went to Saudi Arabia to take care of business and left my kids with him and his wife for 4 months. When I came back to Indonesia, he had already divorced his wife without reason, and his wife was pregnant with their second child. I was very surprised. His wife told me that while I was in Saudi Arabia, my husband often went to nightclubs with his aunt. There he was introduced to something that was new to him. He started drinking and having an affair with one off the hostesses at the nightclub. The money we made from our business he often gave to her and gave her a house. During that period, he rarely came home and did not provide for me and our children.*

*A year and a half later, I asked for a divorce, but he refused. I got a phone call from my aunt (my mother's sister) in Egypt. She was sick and needed my help.  So I went to Egypt, in*

11

1994 with my daughter, Manal. While I was there, I had to have a surgery to remove my gallbladder. While I was in the hospital, I saw Yosra, Rashid's younger sister, and she was very surprised to see me. She told me that Rashid, until this moment, was still waiting for me. I gave her my aunt's phone number, and Rashid started to call me from America. I told him that sometime soon, I would come to visit him in America.

Two months later, I went back to Indonesia, and saw that my husband changed and was even worse than before. We got divorced in 1995. By that time my father had already passed away, so I had nowhere to go.

Three months after my divorce, I got a phone call from my aunt who said that she was going to America for a surgery and wants me to come along. So I started processing my visa to come to America. I went back to Cairo, Egypt, and processed my visa to go to England, because my aunt wanted to go there after coming back from the US. My aunt and I went to Houston, TX in 1995 and we stayed there for 5 days while my aunt had a heart surgery. There I called Rashid and he came to Houston to meet me for the first time in 25 years.

After this meeting, Rashid and I stayed in contact every day. My aunt and I stayed in England for 2 weeks, and then went back to Egypt. Two weeks later, I went back to Jakarta, Indonesia and stayed with my daughter, Halla. My ex-husband, Haydar, left the house that we rented and took our daughters and stayed with his older sister.

Six months later, I went to Egypt to visit my aunt. Rashid and his wife were also in Egypt at that time. I went to his family's house and met his wife. One month later, I went back to Jakarta, Indonesia.

A year later, 1997, I came to America for about 3 to 4 months and then returned to Indonesia. A year later, I heard that Rashid divorced his wife and asked for me to return to the

*US to marry him. In 1998/1999 (not sure of the exact year), I heard the news that my ex-husband, Haydar, was very ill.  In 1999, he passed away. I had to return to Indonesia to pick up my children, Mannatullah and Manal, 12 and 8 years old, respectively.*

*At that time, we discovered that Manna had a heart problem and needed to have a heart surgery as soon possible. Rashid quickly tried to add her on to his insurance plan. I took my daughters to America on June of 1999. Manna had the open heart surgery in August of 1999. In 2000, Rashid's job was transferred to Harrisburg, Pennsylvania.*

In addition to Ms. Ziadeh's own personal history, it is important to note that she has remained on pretrial release during the duration of this case.  Ms. Ziadeh has conformed her conduct appropriately since her arrest.  Ms. Ziadeh has faithfully fulfilled her obligation to the United States Attorney, case agents and this Court.

Ms. Ziadeh has a number of health issues which are concerning.  While Ms. Ziadeh has been fortunate in avoiding serious life-threatening events, the combination of current diagnosis will cause Ms. Ziadeh's health to rapidly decline if not properly treated.  Congress has found that such treatment is more appropriately provided in the community.  The PSR appropriately reflects the medical conditions Ms. Ziadeh suffers.

Additionally, Ms. Ziadeh has engaged in charitable activities.  Specifically, she has donated money for providing school books and uniforms for orphans in Indonesia.  She also made donations that provided books in Braille for the blind.

As this Court is aware, Ms. Ziadeh has a family and a commitment to her faith.  Her interactions with this Court, the United States Attorney, and her defense counsel have demonstrated her kind nature, respect for authority, and deep devotion to her faith and family.

Additionally, Ms. Ziadeh's family and friends provide a strong support system for her. Ms. Ziadeh has learned from this offense, and will look to her family and her faith to help her overcome the embarrassment she feels as a result of these charges.

Obviously, Ms. Ziadeh has faced hardships in her life. This case is no different. Ms. Ziadeh has dealt with and overcome many obstacles, and hopes that this Court will allow her to overcome this hurdle in her life by permitting her to serve a probationary sentence. This would adequately punish Ms. Ziadeh and take into account her history and characteristics.

**2.      The Need for the Sentence Imposed To Promote Certain Statutory Objectives**:

   **(A) to reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense**

Section 3553(a)(2)(A) requires the judge to consider "the need for the sentence[2] imposed . . . to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." A sentence that is excessive in light of the seriousness of the offense promotes disrespect for law and provides unjust punishment. The purposes set forth in § 3553(a)(2)(A) are generally referred to, collectively, as "retribution," which has been defined as follows:

> First, retributive, or "just deserts," theory considers only the defendant's past actions, not his or her probable future conduct or the effect that the punishment might have on crime rates or otherwise. Second, retribution examines the actor's degree of blameworthiness for his or her past actions, focusing on the offense being sentenced. . . . Third, the degree of blameworthiness of an offense is generally assessed according to two kinds of elements: the nature and seriousness of the harm caused or threatened by the crime; and the offender's degree of

---

2 The Comprehensive Crime Control Act of 1984 makes probation a sentence in and of itself. 18 U.S.C. § 3561. Probation may be used as an alternative to incarceration, provided that the terms and conditions of probation can be fashioned so as to meet fully the statutory purposes of sentencing, including promoting respect for law, providing just punishment for the offense, achieving general deterrence, and protecting the public from further crimes by the defendant. USSG, Chapter 5, Part B - Probation, Introductory Commentary.

culpability in committing the crime, in particular, his degree of intent (mens rea), motives, role in the offense, and mental illness or other diminished capacity.

Richard S. Frase, *Excessive Prison Sentences, Punishment Goals, and the Eighth Amendment: "Proportionality" Relative to What?*, 89 Minn. L. Rev. 571, 590 (February 2005).

When looking at these factors, this Court should consider the following:

1)      Ms. Ziadeh accepts responsibility for her actions.

2)      Ms. Ziadeh's criminal culpability is diminished significantly based on the following:

      a.   Ms. Ziadeh did provided food, shelter, and medical care.

      b.   Ms. Ziadeh was not motivated by malevolence or ill-will.

      c.   Ms. Ziadeh committed no violent act.

      d.   Ms. Ziadeh has admitted guilt.

      e.   Ms. Ziadeh has flawlessly abided by the terms of pretrial release.

Based on these factors, the Court must balance the seriousness of the offense with the need to provide just punishment and promote respect for the law.  In this instance, Ms. Ziadeh has accepted responsibility for her wrongs and has suffered hardship without ever stepping foot in prison.  Ms. Ziadeh takes this offense seriously and is deeply remorseful for her actions.  The mental anguish caused by this prosecution has been sufficient to discourage Ms. Ziadeh from committing further crimes, and incarcerating Ms. Ziadeh now will do nothing to promote respect for the law, provide just punishment or account for the serious nature of the offense.

Judges must consider *all* of "the kinds of sentences available" by statute, § 3553(a)(3), even if the "kinds of sentence . . . established [by] the guidelines" permit or encourage only prison. *See Gall v. United States*, 552 U.S. 38, 128 S. Ct. 586, 602 & n.11 (2007).  The court, in determining **whether** to impose a term of imprisonment, and, **if** a term of imprisonment is to be

15

imposed, in determining the length of the term, shall consider the factors set forth in section 3553(a) to the extent that they are applicable, recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation.  18 U.S.C. § 3582(a) (emphasis added).

The Supreme Court in *Gall* recognized the substantial restriction of liberty involved in even standard conditions of probation, *Gall*, 552 U.S. 38, 128 S. Ct. 586, 595-96 & n.4 (2007), and that in some cases, "'a sentence of imprisonment may work to promote not respect, but derision, of the law if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing.'" *Id.* at 599 (quoting district court opinion). "It may very often be that release on probation under conditions designed to fit the particular situation will adequately satisfy any appropriate deterrent or punitive purpose." *Id.*

Catherine McVey, Chairman of the Pennsylvania Board of Probation and parole, echoes the reasoning in *Gall,* saying:

> So the issues for us are: Who should we incarcerate? How many people should we incarcerate? For how long should we incarcerate them? And when we think about that, we want to think about what are the objectives of incarceration? The alternative to incarceration is in part an outgrowth of our focus on outcomes. As we focus on outcomes, the emphasis begins to recede from an issue of pure punishment objective, and we begin to then transition to the thoughts of what works to change offender behavior.

*Proceedings from the Symposium on Alternatives to Incarceration* at 10 (July 14-15, 2008), *available at* http://www.ussc.gov/SYMPO2008/Material/02_FINAL_Overview %20of%20Alternative%20SentencingOptions.pdf

The government suggested a sentence of 18-24 months in its filing. Ms. Ziadeh believes that the statutorily mandated consideration of 18 U.S.C. 3553(a), warrants a probationary sentence.

A sentence of probation reflects the seriousness of the offense, promotes respect for the law, and provides just punishment.

**(B) to afford adequate deterrence to criminal conduct**

Research has consistently shown that while the certainty of being caught and punished has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects." Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1, 28 (2006). "Three National Academy of Science panels . . . reached that conclusion, as has every major survey of the evidence." *Id*.; *see also* Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 Cardozo J. Conflict Resol. 421, 447-48 (2007) ("[C]ertainty of punishment is empirically known to be a far better deterrent than its severity."). Typical of the findings on general deterrence are those of the Institute of Criminology at Cambridge University. *See* Andrew von Hirsch *et al.*, *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* (1999), summary available at http://members.lycos.co.uk/lawnet/SENTENCE.PDF. The report, commissioned by the British Home Office, examined penalties in the United States as well as several European countries. *Id.* at 1. It examined the effects of changes to both the certainty and severity of punishment. *Id.* While significant correlations were found between the certainty of punishment and crime rates, the "correlations between sentence severity and crime rates . . . were not sufficient to achieve statistical significance." *Id.* At 2. The report concluded that "the studies reviewed do not provide a basis for inferring that increasing the severity of sentences is capable of enhancing deterrent

effects." *Id*. At 1. Research regarding white collar offenders in particular (presumably the most rational of potential offenders) found no difference in the deterrent effect of probation and that of imprisonment. *See* David Weisburd *et al.*, *Specific Deterrence in a Sample of Offenders Convicted of White Collar Crimes*, 33 Criminology 587 (1995); *see also* Gabbay, *supra*, at 448-49 ("[T]here is no decisive evidence to support the conclusion that harsh sentences actually have a general and specific deterrent effect on potential white-collar offenders."). According to "the best available evidence, . . . prisons do not reduce recidivism more than noncustodial sanctions." Francis T. Cullen *et al., Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science*, 91 Prison J. 48S, 50S-51S (2011).

Among low-risk offenders, those who spent less time in prison were 4% less likely to recidivate than low-risk offenders who served longer sentences. Valerie Wright, *Sentencing Project, Deterrence in Criminal Justice: Evaluating Certainty v. Severity of Punishment* 7 (2010), available at http://www.sentencingproject.org/doc/Deterrence%20Briefing%20.pdf. Thus, when prison sentences are relatively short, offenders are more likely to maintain their ties to family, employers, and their community, all of which promote successful reentry into society. *Id.* Conversely, when prisoners serve longer sentences they are more likely to become institutionalized, lose pro-social contacts in the community, and become removed from legitimate opportunities, all of which promote recidivism. *Id.*

Ms. Ziadeh is 62 years old, a first offender, has been employed, is married, and has no history of drug or alcohol abuse. For all female offenders in Criminal History Category I, recidivism rates are less than men, which reoffend 15.2% of the time.  For those over age 50 at the time of sentencing; however, the rate in Category I is only 6.2%. For those who have been employed, the rate is 12.7%; and for those who were ever married, the rate is 9.8%. For those

with no history of illicit drug use, the recidivism rate is half that of those who do have a drug history. For those like Ms. Ziadeh who have been employed, have been married, are drug free and over 50, the recidivism rate is certainly much lower. *See* U.S. Sent'g Comm'n, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines,* at Exh. 9, at 28; Exh. 10, at 29 (May 2004) [hereinafter *Measuring Recidivism*]. Finally, offenders like Ms. Ziadeh with zero criminal history points have a rate of recidivism half that of offenders with one criminal history point. *See* Sent'g Comm'n, *Recidivism and the "First Offender,"* at 13-14 (May 2004) [hereinafter *First Offender*].

The Commission has recognized the advisability of revising the guidelines to take age and first offender status into account. *See First Offender* at 1-2 (identifying goal of "refin[ing] a workable 'first-offender' concept within the guideline criminal history structure"); *Measuring Recidivism* at 16 (noting that "[o]ffender age is a pertinent characteristic" that would "improve [the] predictive power of the guidelines "if incorporated into the criminal history computation"). The Commission has not implemented any such revisions to the criminal history guidelines, but has recently stated that age "may be relevant" in granting a departure. USSG § 5H1.1, p.s.

In imposing the least sentence sufficient to account for the need to protect the public from further crimes of Ms. Ziadeh, this Court should consider the statistically low risk of recidivism presented by Ms. Ziadeh' history and characteristics. *See, e.g.*, *United States v. Darway,* 255 Fed. Appx. 68, 73 (6th Cir. 2007) (upholding downward variance on basis of defendant's first-offender status); *United States v. Hamilton*, 323 Fed. Appx. 27, 31 (2d Cir. 2009) ("the district court abused its discretion in not taking into account policy considerations with regard to age recidivism not included in the Guidelines"); *United States v. Holt*, 486 F.3d 997, 1004 (7th Cir. 2007) (affirming below-guideline sentence based on defendant's age, which made it unlikely that

he would again be involved in a violent crime); *United States v. Urbina*, slip op., 2009 WL 565485, *3 (E.D. Wis. Mar. 5, 2009) (considering low risk of recidivism indicated by defendant's lack of criminal record, positive work history, and strong family ties); *United States v. Cabrera*, 567 F. Supp. 2d 271, 279 (D. Mass. 2008) (granting variance because defendants "with zero criminal history points are less likely to recidivate than all other offenders"); *Simon v. United States*, 361 F. Supp. 2d 35, 48 (E.D.N.Y. 2005) (basing variance in part on defendant's age of 50 upon release because recidivism drops substantially with age); *United States v. Nellum*, 2005 WL 300073 at *3 (N.D. Ind. Feb. 3, 2005) (granting variance to 57-year-old defendant because recidivism drops with age); *United States v. Ward,* 814 F. Supp. 23, 24 (E.D. Va. 1993) (granting departure based on defendant's age as first-time offender since guidelines do not "account for the length of time a particular defendant refrains from criminal conduct" before committing his first offense).

A lengthy jail sentence is counter-productive in this particular instance.  While Ms. Ziadeh understands that this Court must operate within the parameters of statutory mandates and the sentencing guidelines, the Court should be mindful of the significant loss Ms. Ziadeh faces if sentenced to prison.

Ms. Ziadeh has never been imprisoned.  A term of probation will adequately deter Ms. Ziadeh, and white-collar criminals generally from further criminal conduct.  The fact that Ms. Ziadeh was convicted of a white-collar, non-violent offense supports the proposition that a short sentence is sufficient to deter her and other from any future misconduct.

This Court, after considering the need to deter Ms. Ziadeh through specific deterrence and others similarly situated individuals through general deterrence, should find that a sentence

of probation is sufficient, but not greater than necessary based on the need to provide adequate

deterrence.

### (C) to protect the public from further crimes of the defendant

Todd A. Bussert, a private attorney with the Law Office of Todd A. Bussert, at a

Symposium on Alternatives to Incarceration held by the United States Sentencing Commission.

>   The *State of the Bureau*, the BOP's publication, 18.5
>   percent of its population in 2006 is in minimum security, 39.6
>   percent low security. These are the types of low-risk, moderate-
>   risk offenders that all these state officials have been coming in and
>   talking about, advocating short periods of confinement, intensive
>   services, and get them back into the community because the longer
>   they stay in, the more likely they are to recidivate. These are the
>   people we're talking about. I'm not talking about offense types, or
>   in terms of the drugs, or what have you, but just looking at the
>   individuals. The BOP has a risk assessment tool. They think these
>   people are relatively low risk. So 18.5 percent of the people can
>   walk out of a prison camp any time and walk into your community,
>   but by and large they don't, and these are people that I would
>   argue—probably 90 percent—who could be returned to the
>   communities tomorrow, and there's going to be no difference in
>   public safety.
>
>   The issue is one of retribution. It's not incapacitation. And
>   in terms of rehabilitation and things of that nature, I just want to
>   just make two quick points. Statutorily, 18 U.S.C. § 3582, what
>   Congress directs is after the courts consider section 3553(a)
>   factors, they must recognize that imprisonment is not an
>   appropriate means of promoting rehabilitation. So statutorily it's
>   not correct, and in talking about where we should be going, 28
>   U.S.C. § 994(k), the Commission shall ensure that the guidelines
>   reflect the inappropriateness of imposing a sentence to a term of
>   imprisonment for the purpose of rehabilitating the defendant or
>   providing the defendant with needed educational or vocational
>   training, medical care or other correctional treatment. It's
>   wonderful BOP provides these services. They're necessary. It
>   helps the offenders when they're reintegrating into the community,
>   but the reality is, all these things can go for a large number of
>   offenders. These same types of services can and should be
>   provided in the community. You don't need to resort to
>   confinement.

Proceedings from the Symposium on Alternatives to Incarceration (July 14-15, 2008) at 396, *available at* http://www.ussc.gov/SYMPO2008/ Material/19_FINAL_AlternativesinGLs.pdf, (emphasis added). This suggests that Ms. Ziadeh, clearly a low risk offender based on her lack of criminal history, community involvement, family involvement, and dedication to her faith is an appropriate candidate for probation.

Additionally, Ms. Ziadeh's age suggests she is less likely to recidivate. Her risk of recidivism is extremely low because of her age. In addition, prison will take a toll on Ms. Ziadeh's well-being.

> "[S]everal important factors seem to speed the aging process for those in prison. These factors include the amount of stress experienced by new inmates trying to survive the prison experience unharmed; efforts to avoid confrontations with correctional staff and fellow inmates; financial stress related to inmates' legal, family, and personal circumstances . . ." National Institute of Corrections, Department of Justice, *Addressing the Needs of the Elderly, Chronically Ill, and Terminally Ill Inmates* at 8 (2004 ed.). "First time incarcerated older inmates are frequently severely maladjusted and especially at risk for suicide, explosiveness, and other manifestations of mental disorder. Since their behaviors are not well tolerated by other inmates their victimization potential is high." *Id.* at 11. "Recidivism rates decline relatively consistently as age increases. Generally the younger the offender, the more likely the offender recidivates. . . Among all offenders under the age 21, the recidivism rate is 35.5%, while offenders over the age of 50 have a recidivism rate of 9.5 percent."

United States Sentencing Commission, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines* at 12 (Nov. 2004).

Ms. Ziadeh would be devastated by a term of imprisonment. A history with depression, medical difficulties, advanced age and attempted suicides make it abundantly clear that prison

would be severely detrimental to Ms. Ziadeh's health, both mentally and physically. A term of imprisonment is not needed to protect the public from further crimes of Ms. Ziadeh. Her admission of guilt, age, family history, and palpable remorse all lead to the conclusion that Ms. Ziadeh will not break the law in the future. Thus a term of probation is sufficient, but not greater than necessary.

**(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner**

Ms. Ziadeh does not use drugs or alcohol, is unable to work and receives appropriate medical treatment. Therefore, Ms. Ziadeh is not in need of any educational, vocational, medical, or drug treatment that may be offered through the Bureau of Prisons. A term of imprisonment would not provide Ms. Ziadeh with any needed treatment that is not already being provided. Additionally, a term of imprisonment would disrupt her current treatment routine. Thus, imprisonment would be counter-productive.

**3.      The Kinds of Sentences Available**

In *Booker*, the Supreme Court severed and excised 18 U.S.C. § 3553(b), the portion of the federal sentencing statute that made it mandatory for courts to sentence within a particular sentencing guidelines range. *Booker,* 125 S. Ct. at 756. This renders the sentencing guidelines advisory. *Id.*

The offense for which Ms. Ziadeh pled guilty is a Class C felony. 18 U.S.C. §3559(a)(3). Because these offenses are not Class A or B felonies, 18 U.S.C. § 3561 specifically provides that Ms. Ziadeh may be sentenced to a term of probation. Even though the U.S.S.G. 5B1.1(a) recommends a non-probationary sentence, the Court may impose a sentence of probation.

**4.      The Sentencing Range Established by the Sentencing Commission**

Ms. Ziadeh contests the accuracy of the technical guideline range as calculated in the

Presentence Report.  Ms. Ziadeh has filed Objections to the Presentence Report that preserves the factual issues more thoroughly.  Each objection will be discussed in the order they appear in the Presentence Report.

Ms. Ziadeh objects to the application of six points in paragraph 58 of the presentence report.  The government bears the burden of proving the number of aliens involved.  This showing must be made by a preponderance of the evidence.  Additionally, the government must show that the alien was smuggled, transported or harbored illegally.

In this instance, there are five specific individuals charged in the indictment that qualify as aliens.  As part of the plea, Ms. Ziadeh agreed that those aliens qualified, but has made no admission as to any other individuals.  Additionally, even if Ms. Ziadeh assisted women in coming to the United States from Indonesia, there must be evidence that those aliens were harbored with Ms. Ziadeh's knowledge.  Presumably, their entry into the United States to work as foreign domestic employees was legal, and; therefore, does not count as relevant conduct until some evidence is shown that they were harbored with Ms. Ziadeh's knowledge.  In other words, if the aliens entered the United States with authority they cannot be counted under 2L1.1(b)(2)(B) against the total number of aliens unless they were subsequently harbored outside their immigration authority with Ms. Ziadeh's knowledge.  Thus, aliens who arrived in the United States and disappeared of their own free will cannot be counted as harboring since the intention was that they arrived and would remain in the United States legally.

The application of two additional points under 2L1.1(b)(6) is inappropriate. The courts have interpreted this enhancement a number of ways, but in each instance the courts were discussing the transportation of aliens.  In this instance, there were no overcrowded trucks, trailers, boats or cars.  Because there was no abnormally dangerous transportation of any

individual in this case, this enhancement should not apply. A search of relevant case law did not reveal any case that discussed the application of this enhancement to a case where an individual had a medical issue, but was being properly treated and transported and housed appropriately. In any event, Ms. Ziadeh and Mr. Ziadeh made every effort to obtain proper medical treatment for Nani Martini. They did not recklessly or intentionally create a substantial risk of death or serious injury.

Application of 2L1.1(b)(8)(A)(ii) is also inapplicable. No individual in this case was involuntarily detained through coercion or threat by Ms. Ziadeh. There is a clear record showing that any one of these individuals could come and go as they pleased. Ms. Ziadeh did not threaten harm, request ransom, or demand payment for the release of any individual in this case.

An increase of four points under 3B1.1(a) may not include aliens as participants. Therefore, less than five participants were involved in this offense. Additionally, while a number of individuals were assisted in finding other employment by the Ziadehs or were allowed to live with Ziadehs the overall criminal activity was limited and should not be considered extensive.

Unfortunately, the situation involved in this case is not as widely discussed as cases involving alien smuggling across borders or the hiring of illegal aliens. This Court is tasked with determining which enhancements to apply in this case. The government and Ms. Ziadeh have agreed that none of these enhancements should apply. Ms. Ziadeh suggests that the application of any such enhancement is unfounded and that her guidelines range should begin at a base offense level of 12 and be increased by 4 points for less than 25 aliens. With acceptance of responsibility this would place Ms. Ziadeh at an offense level 13 and 12-18 months at a criminal history category 1.

Wherefore, when considering the proper calculation of the guidelines, this Court should find that the appropriate guideline range is 12-18 months.  Additionally, Ms. Ziadeh requests that this Court vary from that guideline range to a sentence of probation.

**5.      The Need To Avoid Unwarranted Disparities**

It is incumbent on this Court to, "consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue."  *Koon v. United States*, 518, U.S. 81, 113 (1996).  Ms. Ziadeh must be sentenced based on the individual factors presented to this Court.

**6.      The Need To Provide Restitution To Any Victims of the Offense**

In applying the restitution provisions of the Victim and Witness Protection Act, district courts must make specific findings regarding the factual issues that are relevant to the Act. *United States v. Logar,* 975 F.2d 958, 961 (3d Cir.1992) (quoting *United States v. Palma,* 760 F.2d 475, 480 (3d Cir.1985)).  In *United States v. Logar,* we identified the necessary factual findings: (1) the amount of loss, (2) the Defendant's ability to pay and the financial needs of the Defendant's and the Defendant's dependents, and (3) the relationship between the restitution imposed and the loss caused by the Defendant's conduct. *Logar,* 975 F.2d at 961. The government has the burden of demonstrating by a preponderance of the evidence the amount of loss sustained by a victim. *United States v. Palma,* 760 F.2d at 480; 18 U.S.C. § 3580(d).  United States v. Graham, 72 F.3d 352, 356 (3d Cir. 1995).

**<u>SUMMARY OF THE LAW</u>**

On January 12, 2005, the Supreme Court ruled that its Sixth Amendment holding in *Blakely v. Washington*, 124 S. Ct. 2531 (2004) and *Apprendi v. New Jersey*, 530 U.S. 466 (2000)

applies to the Federal Sentencing Guidelines. *United States v. Booker*, 125 S. Ct. 738, 756 (2005). Given the mandatory nature of the Sentencing Guidelines, the Court found "no relevant distinction between the sentence imposed pursuant to the Washington statutes in *Blakely* and the sentences imposed pursuant to the Federal Sentencing Guidelines" in the cases before the Court. Id. at 751. Accordingly, reaffirming its holding in Apprendi, the Court concluded that

> [a]ny fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt.

Id. at 756.[3][1]

Based on this conclusion, the Court further found those provisions of the Federal Sentencing Reform Act of 1984 that make the Guidelines mandatory, 18 U.S.C. § 3553(b)(1) or which rely upon the Guidelines' mandatory nature, 18 U.S.C. § 3742(e), incompatible with its Sixth Amendment holding. *Booker*, 125 S. Ct. at 756. Accordingly, the Court severed and excised those provisions, "mak[ing] the Guidelines effectively advisory." *Id.* at 757.

Instead of being bound by the Sentencing Guidelines, the Sentencing Reform Act, as revised by *Booker*, requires a sentencing court to consider Guidelines ranges, see 18 U.S.C.A. § 3553(a)(4) (Supp.2004), but it permits the court to tailor the sentence in light of other statutory concerns as well, see § 3553(a). *Booker*, 125 S. Ct. at 757. Thus, under *Booker*, sentencing courts must treat the guidelines as just one of a number of sentencing factors set forth in 18 U.S.C. § 3553(a).

The primary directive in Section 3553(a) is for sentencing courts to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph 2."

Section 3553(a)(2) states that such purposes are:

> (A)   to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> (B)   to afford adequate deterrence to criminal conduct;
> (C)   to protect the public from further crimes of the defendant; and
> (D)   to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

In determining the minimally sufficient sentence, § 3553(a) further directs sentencing courts to consider the following factors:

> 1) "the nature and circumstances of the offense and the history and characteristics of the defendant" (§ 3553(a)(1);
> 2) "the kinds of sentences available" (§ 3553(a)(3);
> 3) "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct" (§ 3553(a)(6); and
> 4) "the need to provide restitution to any victims of the offense." (§ 3553(a)(7).

Other statutory sections also give the district court direction in sentencing. Under 18 U.S.C. § 3582, imposition of a term of imprisonment is subject to the following limitation: in determining whether and to what extent imprisonment is appropriate based on the Section 3553(a) factors, the judge is required to "recogniz[e] that imprisonment is ***not*** an appropriate means of promoting correction and rehabilitation" (emphasis added).

Under 18 U.S.C. § 3661, "***no limitation*** shall be placed on the information concerning the background, character, and conduct of [the defendant] which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence" (emphasis added). This statutory language certainly overrides the (now-advisory) policy statements in Part H of the sentencing guidelines, which list as "not ordinarily relevant" to sentencing a variety of factors such as the defendant's age, educational and vocational skills, mental and emotional conditions, drug or alcohol dependence, and lack of guidance as a youth. *See* U.S.S.G. § 5H1. The directives of *Booker* and § 3553(a) make clear that courts may no longer uncritically apply the

guidelines.  Such an approach would be "inconsistent with the holdings of the merits majority in *Booker*, rejecting mandatory guideline sentences based on judicial fact-finding, and the remedial majority in *Booker*, directing courts to consider all of the §3353(a) factors, many of which the guidelines either reject or ignore." *United States v. Ranum*, 353 F. Supp. 2d 984, 985-86 (E.D. Wisc. Jan. 19, 2005) (Adelman, J.).  As another district court judge has correctly observed, any approach which automatically gives "heavy" weight to the guideline range "comes perilously close to the mandatory regime found to be constitutionally infirm in *Booker*." *United States v. Jaber*, __ F. Supp. 2d __, 2005 WL 605787 *4 (D. Mass. March 16, 2005) (Gertner, J.).  *See also United States v. Ameline*, 400 F.3d 646, 655-56 (9th Cir. Feb. 9, 2005) (advisory guideline range is "only one of many factors that a sentencing judge must consider in determining an appropriate individualized sentence"), *reh'g en banc granted*, 401 F.3d 1007 (9th Cir. 2005).

Justice Scalia explains the point well in his dissent from *Booker's* remedial holding:

> Thus, logic compels the conclusion that the sentencing judge, after considering the recited factors (including the guidelines), has full discretion, as full as what he possessed before the Act was passed, to sentence anywhere within the statutory range.  If the majority thought otherwise if it thought the Guidelines not only had to be 'considered' (as the amputated statute requires) but had generally to be followed its opinion would surely say so.

*Booker*, 125 S. Ct. at 791 (Scalia, J., dissenting in part).  Likewise, if the remedial majority thought the guidelines had to be given "heavy weight," its opinion would have said so.  The remedial majority clearly understood that giving any special weight to the guideline range relative to the other Section 3553(a) factors would violate the Sixth Amendment.

In sum, in every case, a sentencing court must now consider **all** of the § 3553(a) factors, not just the guidelines, in determining a sentence that is sufficient but not greater than necessary to meet the goals of sentencing.  And where the guidelines conflict with other sentencing factors

set forth in § 3553(a), these statutory sentencing factors should generally trump the guidelines. *See United States v. Denardi*, 892 F.2d 269, 276-77 (3d Cir. 1989) (Becker, J, concurring in part, dissenting in part) (arguing that since § 3553(a) requires sentence be no greater than necessary to meet four purposes of sentencing, imposition of sentence greater than necessary to meet those purposes violates statute and is reversible, even if within guideline range).

## Conclusion

For the foregoing reasons, Ms. Ziadeh respectfully requests that this Court sentence her to a sentence of probation followed by supervised release.  Ms. Ziadeh submits that this sentence provides appropriate consideration of the factors contained in 18 U.S.C. 3553(a) and is sufficient, but not greater than necessary to meet the statutory goals of sentencing.

Respectfully submitted this 7th Day of November, 2013.

s/ Bradley L. Henry
The Blanch Law Firm, PC
Attorney for Nura Ziadeh.
261 Madison Avenue
12th Floor
New York, NY 10016
(212) 736-3900
Bhenry@blanchpc.com

## CERTIFICATE OF SERVICE

I do hereby certify that on November 7, 2013, a copy of the foregoing document was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. All other parties will be served by U.S. mail or email. Parties may access this filing through the Court's electronic filing system.

s/ Bradley L. Henry